**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| ENVIRONMENTAL SOURCE CORPORATION | : : | Case No. 10-41752-MSH |
| DEBTOR | : | |
| ENVIRONMENTAL SOURCE CORPORATION | : : | |
| PLAINTIFF, | : | |
| v. | : | Adv. Pro. No. 10-4082-MSH |
| MASSACHUSETTS DIVISION OF OCCUPATIONAL SAFETY; MASSACHUSETTS DIVISION OF UNEMPLOYMENT ASSISTANCE; AND MASSACHUSETTS DEPARTMENT OF INDUSTRIAL ACCIDENTS | : : : : : : | |
| DEFENDANTS | : | |

**MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF**

This matter came before me on June 2, 2010 for a continued non-evidentiary hearing[1] on the Debtor Plaintiff's Emergency Motion for Injunctive Relief [#2] for the purpose of considering whether to extend a temporary restraining order entered on May 27, 2010 by entry of a preliminary injunction prohibiting the Commonwealth of Massachusetts through any of the Defendant agencies, including the Massachusetts Department of Industrial Accidents ("DIA"), from continuing to deny the Debtor an asbestos removal license and from enforcing MASS. GEN. LAWS ch. 152, § 25C(10),[2] which prohibits the Debtor "from bidding or participating in any state

---

[1] Although the hearing was non-evidentiary, the Department of Industrial Accidents submitted the Affidavit of Raymond E. Marchand, Jr., Director of the Office of Investigations for the Department of Industrial Accidents, (the "Marchand Affidavit"). Following the hearing the Debtor submitted the Affidavit of Jose Pena, the Debtor's president (the "Pena Affidavit").

[2] M.G.L.c. 152 § 25C(10) provides:

or municipal funds contracts" for three years. In attendance at the hearing were counsel for the Debtor, assistant Massachusetts attorneys general on behalf of each of the Defendants, and counsel for other parties with an interest in the Chapter 11 case.

**BACKGROUND**

The Debtor is in the business of commercial asbestos removal and mitigation (Pena Affidavit at ¶ 1). The Debtor operates a union shop and bids and works only on "prevailing wage jobs" (*Id.* at ¶¶ 2 and 3), meaning publically funded projects for which a governmental unit requires that a contractor's employees performing work on those projects be paid a minimum wage determined by the government (*Id.* at ¶ 4). As a union shop, the Debtor's labor costs are higher than non-union shops and, therefore, the Debtor cannot outbid non-union shops for private contract work (*Id.* at ¶ 5). Because all contractors bidding on public contracts must pay the prevailing wage, the Debtor competes for and performs work only in this sector (*Id.*).

On September 4, 2009, prior to the Debtor's bankruptcy filing, its workers' compensation insurance policy was canceled for non-payment of the premium (Marchand Affidavit at ¶ 4). On September 24, 2009, an investigator for the DIA determined that the Debtor lacked workers' compensation insurance and was not qualified as a self-insurer (*Id.* at ¶ 3). Consequently, on the same day, the investigator issued a so-called Stop Work Order requiring the Debtor to cease doing business in the Commonwealth (*Id.* at ¶ 5). In addition, the Debtor incurred civil penalties

---

In addition to being subject to the civil penalties herein provided, an employer who fails to provide for insurance or self insurance as required by this chapter or knowingly misclassifies employees, to avoid higher premium rates, will be immediately debarred from bidding or participating in any state or municipal funded contracts for a period of three years and shall when applicable be subject to penalties provided for in section fourteen.

2

of $250 a day pursuant to MASS. GEN. LAWS ch. 152, § 25C.

The Debtor appealed the issuance of the Stop Work Order and at the appeal hearing requested and was granted a continuance. The Debtor failed to appear at the continued hearing (*Id.* at ¶ 8). On April 8, 2010 the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code. Shortly thereafter, the Debtor obtained workers' compensation insurance.

Subsequent to the commencement of the Chapter 11 case, the Division of Occupational Safety ("DOS") denied the Debtor's application for renewal of its asbestos removal license for reasons which included the lack of workers' compensation insurance, the existence of unpaid monetary obligations to state agencies, and the existence of the Stop Work Order. The Debtor commenced this adversary proceeding and sought emergency injunctive relief against the Defendant state agencies.

On May 27, 2010, I held a hearing on the Debtor's Emergency Motion for Injunctive Relief and at the hearing the DOS acknowledged that, in light of the Debtor's bankruptcy, it could no longer condition the issuance of the asbestos removal license on the payment of outstanding prepetition obligations to any governmental authority and agreed that if the Debtor submitted an application it would be acted upon within 3 business days, provided that the Stop Work Order was removed or closed. The DIA agreed to "close" the Stop Work Order, which its counsel explained would terminate the accrual of fines assessed against the Debtor, thereby allowing the DOS to issue the license, but still permit the other provisions of MASS. GEN. LAWS ch. 152, § 25C to remain in force, including the three year debarment from public works projects pursuant to MASS. GEN. LAWS ch. 152, § 25C(10). Following the hearing, I entered a temporary restraining order prohibiting the DIA from enforcing the three year debarment on the grounds

3

that application of the statute to this Debtor violates the Supremacy Clause of the United States Constitution as well as 11 U.S.C. § 525(a). A continued hearing to consider further relief was scheduled for June 2, 2010. At the June 2nd hearing the Debtor acknowledged that the DIA had closed the Stop Work Order and the DOS had issued the Debtor's asbestos removal license. With its insurance and license in place and the Stop Work Order closed, the Debtor is ready to begin work on a number of outstanding public works contracts, the proceeds from which will be the Debtor's means of funding its reorganization. However, the DIA continues to insist that it must enforce the three year debarment, effectively preventing the Debtor from beginning such work.

**POSITION OF THE PARTIES**

The DIA argues that enforcement of MASS. GEN. LAWS ch. 152, § 25C(10)'s debarment, which arose prepetition, is an effective exercise of the Commonwealth's police power and thus its continued enforcement is not subject to the automatic stay imposed under 11 U.S.C . § 362 upon the commencement of the Debtor's Chapter 11 case. It submitted the Marchard Affidavit as evidence that the Debtor's debarment is not a result of its failure to pay prepetition fines but rather a result of the application of the statute (*Id.* at ¶ 7). The DIA also contends that it lacks discretion to excuse or shorten the debarment period, which contention appears to be based on Mr. Marchard's experience during the two years he has been Director of Investigations, that no employer has been removed from the debarment list prior to the expiration of the applicable three year period. Moreover the DIA argues that the Debtor is free to conduct business in the state for the next three years, albeit in the private sector only. The DIA advances these same arguments in support of its contention that the Debtor's indebtedness arising from the penalties imposed as a result of the lapse in workers' compensation insurance was not a reason, much less

4

the *sole* reason, for the debarment and thus enforcement of the debarment does not violate 11 U.S.C. § 525(a). The DIA cites F.C.C. v. NextWave Personal Communications Inc., 537 U.S. 293, 301-02, 123 S.Ct. 832, 838-39, 154 L.Ed.2d 863 (2003), as support for this position.

The Debtor asserts that it does not conduct business in the private sector because it cannot compete with non-union shops. The Debtor alleges that the DIA's enforcement of the debarment is not a police power function and is thus subject to the automatic stay of § 362, pointing to the fact that the debarment statute permits debarred employers to conduct business in the state, just not *with* the state or other governmental entities. The Debtor describes the statute as a means for the state to further its pecuniary interest and argues that its continued enforcement is a violation of the antidiscrimination provision of Bankruptcy Code § 525(a) because the Debtor is being punished for its prepetition insolvency. The Debtor cites In re The Bible Speaks, 69 B.R. 368 (Bankr. D. Mass. 1987), as support for its position.

**DISCUSSION**

A party seeking a preliminary injunction must demonstrate:

> (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

Foxboro Co. v. Arabian American Oil Co., 805 F.2d 34, 36 (1st Cir. 1986). Here there is no question that the harm which the Debtor will suffer if the debarment statute is enforced, namely being put out of business, is irreparable and outweighs any harm to the state or the public interest. Indeed, given that the Debtor now has the required insurance, it is difficult to envision any harm which the state or the public interest will suffer. The DIA argues that MASS. GEN. LAWS ch. 152, 25C(10) is a deterrent and allowing offending companies to escape punishment

5

by seeking refuge in the bankruptcy court will undermine that deterrent to the ultimate detriment of the state and its citizenry. I find that the immediate, tangible harm to the Debtor of being put out of business by enforcement of the debarment statute outweighs the theoretical and somewhat nebulous harm to the state and the public from enjoining its enforcement. The efficacy of the statute as a deterrent must be questioned when it has no impact whatsoever on companies which do not do business with governmental authorities. The only remaining question is whether the Debtor is likely to succeed on the merits of its action. I answer in the affirmative for the reasons set forth below.

*MASS.GEN. LAWS ch. 152, § 25C(10) and the Supremacy Clause*

Prior to the enactment of the Bankruptcy Code of 1978, courts invoked the Supremacy Clause of the United States Constitution[3] as a basis for ensuring that states could not frustrate the Congressional policy of providing debtors in bankruptcy with a fresh start. In the seminal case of Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), a case decided under the Bankruptcy Act, the Supreme Court held an Arizona statute, which conditioned the reinstatement of a debtor's driver's license upon the payment of a dischargeable debt, unconstitutional because it conflicted with the Bankruptcy Act's discharge provision. The Court declared that "[d]eciding whether a state statute is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are

---

[3] Article VI, Clause 2 provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

6

in conflict." *Id.* at 644, 91 S.Ct. at 1708.

There is no legislative history or state court interpretation of MASS. GEN. LAWS ch. 152, § 25C(10). The Supreme Judicial Court, in examining the Workers' Compensation Act, of which chapter 25C is but one part, has acknowledged that "[t]he penalties may be harsh for those employers who fail to comply with their duties under the Act." LaClair v. Silberline Mfg. Co., Inc., 379 Mass. 21, 26, 393 N.E.2d 867, 870 (1979).

In Brown v. Leighton, 85 Mass. 757, 760-61, 434 N.E.2d 176, 179 (1982), the SJC stated:

> The Workmen's Compensation Act has been compulsory for most employers since 1943…. [F]ailure to insure through a private insurer or to qualify as a self-insurer as required by G.L. c. 152, § 25A, carries with it severe penalties. Where an employer refuses to comply with the statutory mandate, it may be held liable in an action for tort damages without regard to its negligence or other fault. In addition, the common law defenses of fellow servant, assumption of the risk, and contributory negligence are inapplicable if the employee's injury arises in the course of employment…. Criminal penalties for noncompliance with the Act's mandate are provided by G.L. c. 152, §25C. A fine of not more than $500 and imprisonment of not more than one year may be imposed on the employer who fails to provide the required coverage. A president or treasurer, or both, of an employer corporation may be held personally liable for this criminal punishment.
>
> [T]hese statutory provisions reveal that the Workmen's Compensation Act is a humanitarian measure designed to provide adequate financial protection to the victims of industrial accidents. There can be little doubt that without the benefits provided by the statute, as enforced through compulsory insurance, many injured employees and their families would be forced to shoulder by themselves large portions of the costs of job-related accidents…. It is manifest that the legislative design in enacting the Act and in making its provisions compulsory on almost all employers was to promote its use throughout the Commonwealth. (Internal citations and quotation marks omitted).

The Bankruptcy Code, as its predecessor the Bankruptcy Act, favors the reorganization of a corporation whenever possible. Chapter 11, like the Act's Chapter X, "is a remedial statute designed to preserve as going concerns those corporations which are financially embarrassed and which are unable to satisfy their obligations…. The preservation of the corporate entity as an

7

active concern is deemed beneficial to those financially interested in the corporation as well as the public and the economy as a whole and should, therefore, be effected whenever possible." In re Southern Land Title Corp., 301 F. Supp. 379, 409 (D.C.La. 1968). Congress described the purpose of Chapter 11 as follows:

> The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders. The premise of a business reorganization is that assets that are used for production in the industry for which they are designed are more valuable than those assets sold for scrap. Often, the return on assets that a business can produce is inadequate to compensate those who have invested in the business. Cash flow problems may develop, and require creditors of the business, both trade creditors and long term lenders, to wait for payment of their claims. If the business can extend or reduce its debts, it often can be returned to a viable state. It is more economically sufficient to reorganize than to liquidate, because it preserves jobs and assets.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 220-21 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6174, 6180.

If the Workers Compensation Act is a humanitarian measure designed to provide financial protection for victims of industrial accidents, then it can be inferred that MASS. GEN. LAWS ch. 152, 25C was intended to further that objective by creating a set of financial penalties, including monetary fines and debarment, to deter violations. Debarment is just another way to strike at the pocketbook by depriving violating employers from a source of income. As noted earlier, however, debarment disproportionately affects businesses such as the Debtor's, which operate in the public sector (ironically because they choose to run union shops). For an asbestos removal contractor operating solely in the private sector, debarment is a hollow threat, a toothless tiger.

But as Perez teaches, financial penalties cannot be allowed to interfere with the goals of the federal bankruptcy statute whose goals include the preservation and rehabilitation of

financially distressed businesses. The debarment provision of MASS. GEN. LAWS ch.152, § 25C(10) thwarts the purpose and policy of Chapter 11 of the Bankruptcy Code by in effect prohibiting the Debtor from operating, thus depriving the Debtor of the ability to generate income. MASS. GEN. LAWS ch.152, § 25C(10) violates the Supremacy Clause and is unconstitutional.

*MASS. GEN. LAWS ch. 152, § 25C(10) and 11 U.S.C. § 525(a)*

With exceptions not relevant to the case at bar, Bankruptcy Code § 525(a) prohibits a governmental unit from discriminating against a debtor because of its bankruptcy or insolvency.[4] The statute has its origins in the Perez case. H.R.REP. NO. 595, 95th Cong., 1st Sess. 366-67 (1977); S.REP. NO. 989, 95th Cong., 2d. Sess. 81 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. Congress left it to the courts to develop and expand the anti-discrimination objective of the statute. "The legislative history to § 525(a) generally supports an expansive application of the discrimination provisions. In re The Bible Speaks, 69 B.R. at 371; Marine

---

[4] Section 525(a) provides:

> (a) Except as provided in the Perishable Agricultural Commodities Act, 1930, the Packers and Stockyards Act, 1921, and section 1 of the Act entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," approved July 12, 1943, a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

11 U.S.C.A. § 525

9

Electric Railway Products Division v. New York City Transit Authority ( In the Matter of Marine Electric Railway Products Division, 17 B.R. 845, 851-52 (Bankr. E.D. N.Y. 1982). Section 525(a)'s list of discriminatory practices is illustrative, not exhaustive. Id. at 852. Those courts supporting the notion that § 525 should be broadly construed focus on the Bankruptcy Code's fresh start policy. Certain courts sought to limit § 525 to situations analogous to those enumerated in the statute, requiring "proof that the discrimination was caused *solely* by the debtor's status…." In re Exquisito Services, Inc., 823 F.2d 151, 153 (5th Cir. 1987) (emphasis supplied). However, the Supreme Court's decision in NextWave, supra, with its expansive definition of the term "solely because," undermines those cases advocating a narrow reading of § 525. See In Re Valentin, 309 B.R. 715 (Bankr. E.D. Pa. 2004).

In NextWave the Court found the debtor's failure to pay a dischargeable debt owed to the Federal Communications Commission was the proximate cause of the cancellation of the debtor's licenses and thus by cancelling the licenses the FCC had violated § 525. The Court rejected the FCC's argument that it had a "valid regulatory motive" for cancelling the licenses, calling the agency's motive "irrelevant." NextWave, 537 U.S. at 301, 123 S.Ct. at 839.

> When the statute refers to failure to pay a debt as the sole cause of cancellation ("solely because"), it cannot reasonably be understood to include, among the other causes whose presence can preclude application of the prohibition, the governmental unit's *motive* in effecting the cancellation. Such a reading would deprive § 525 of all force. It is hard to imagine a situation in which a governmental unit would not have some further motive behind the cancellation-assuring the financial solvency of the licensed entity, … or punishing lawlessness, ... or even (quite simply) making itself financially whole. Section 525 means nothing more or less than that the failure to pay a dischargeable debt must alone be the proximate cause of the cancellation-the act or event that triggers the agency's decision to cancel, whatever the agency's ultimate motive in pulling the trigger may be.

Id. at 301-02, 123 S.Ct. at 839 (internal citations omitted).

NextWave instructs me to ignore as irrelevant the Commonwealth's motive to provide financial protection to victims of industrial accidents and to penalize employers who fail to do

so. The debarment penalty means simply that the Debtor in this case will be punished for not paying a prepetition insurance premium, which led to the temporary cancellation of its workers' compensation insurance policy. The Debtor's prepetition financial incapacity is the proximate cause of the debarment, and therefore, enforcement of the debarment provision violates § 525(a).

*Police Powers and the Automatic Stay*

Upon the debtor's filing of a bankruptcy petition, Bankruptcy Code §362(a) imposes an automatic stay against efforts to assert or recover claims against a debtor or its estate. Section 362(b), however, provides several exceptions to the rule in § 362(a), including § 362(b)(4), which states that the automatic stay provision does not apply to "the commencement or continuation of an action or proceeding by a governmental unit … to enforce such governmental unit's … police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's …police or regulatory power."

As the legislative history of the police power exception notes:

[W]here a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.

H.Rep. No. 595, 95th Cong., 1st Sess. (1977) at 343, reprinted in 1978 U.S.C.C.A.N. 5787, 5838.

The Bankruptcy Code does not define the meaning of "police or regulatory power," however, and as a result, courts have developed the following tests: (1) the "pecuniary purpose" test; and (2) the "public policy" test. In re Mohawk Greenfield Motel Corp., 239 B.R. 1, 6

(Bankr. D. Mass. 1999).[5] "The pecuniary purpose test focuses on whether the governmental action relates primarily to the protection of the government's pecuniary interest in the debtor's property or to matters of public safety and welfare" while "[t]he public policy test distinguishes between proceedings that effectuate public policy and those that adjudicate private rights: only the former are exempted from the automatic stay." Id. (Internal citations and quotation marks omitted).

MASS. GEN. LAWS ch. 152, § 25C(10) satisfies both tests. The primary purpose of the Workers' Compensation Act as a whole is ensuring that employers provide some degree of financial security for employees injured on the job; the use of penalties for non-compliant employers is simply a means by which the state legislature chose to reach that goal. Therefore, the DIA's enforcement of the statute does not violate the automatic stay even though its continued enforcement of the debarment violates the Supremacy Clause and the Bankruptcy Code's anti-discrimination provision.

**CONCLUSION**

In accordance with the foregoing, a separate order shall issue enjoining the Commonwealth, by and through its Department of Industrial Accidents, from enforcing or attempting to enforce MASS. Gen .Law. ch. 152, § 25C(10) pending further order of the Court.

Dated: June 8, 2010

_____
Melvin S. Hoffman
United States Bankruptcy Judge

---

[5] Although Mohawk was decided under a prior version of the police power exception, courts and commentators agree that case law developed under former §§ 362(b)(4) and (5) continues to provide guidance in interpreting current § 362(b)(4). Mohawk, 239 B.R. at 6.

12